**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNDER SEAL,<br>Plaintiff,<br>v.<br>UNDER SEAL,<br>Defendant. | NO. ____________________<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. 3730** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES ex rel. SCOTT ROBERTS,<br><br>Plaintiff and Relator,<br><br>v.<br><br>NATIONSTAR MORTGAGE HOLDINGS INC. and NATIONSTAR MORTGAGE LLC,<br><br>Defendants. | NO. ____________________<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. 3730** |

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 2

III. PARTIES ..... 3

IV. REGULATORY FRAMEWORK ..... 4

A. The Home Equity Conversion Mortgage Program ..... 4

B. HECM Insurance Claims ..... 5

C. Traditional Mortgage Insurance for Single-Family Homes ..... 9

D. HUD's Direct Endorsement Program ..... 10

E. Appraisal Regulations ..... 14

1. Appraiser Independence ..... 16

2. Prohibition on Appraisal Shopping ..... 18

3. Appraisal Requirements in HUD Handbooks and Forms Applicable to Direct Endorsement Lenders ..... 21

V. FACTUAL ALLEGATIONS ..... 23

A. Nationstar is a Large and Important Player in the Mortgage Industry. ..... 23

B. Nationstar's Entry Into the HECM Market ..... 24

C. Nationstar's Scheme to Fraudulently Maximize Government Reimbursements for HECM Properties Through Appraisal Shopping Practices ..... 25

1. Nationstar keeps appraisal values low by manipulating the appraisal process and pressuring appraisers. ..... 27

2. Nationstar orders multiple appraisals over short periods of time in order to obtain lower valuations and prompt sales within six months. ..... 31

D. Examples of Nationstar's Appraisal Shopping for HECM Properties ..... 37

E. Nationstar's Appraisal Inflation Practices for Traditional Mortgage Properties ..... 45

F. Nationstar's False and Fraudulent Appraisal Practices Cause Damages to the Government ..... 47

VI. CAUSES OF ACTION ..... 48

**TABLE OF CONTENTS**
**(continued)**

**Page**

VII. PRAYER FOR RELIEF ........................................................................ 51

JURY TRIAL DEMAND ........................................................................................ 52

# I. INTRODUCTION

1. This is an action brought by *Qui Tam* Plaintiff and Relator Scott Roberts on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the FCA" or "the Act"), arising from Defendants' fraud against the United States Department of Housing and Urban Development ("HUD") in connection with HUD-insured reverse mortgage loans and traditional mortgage loans obtained in New York and throughout the United States.

2. Defendants submitted false and fraudulent claims for mortgage insurance benefits for reverse mortgages insured under the HUD's Home Equity Conversion Mortgage program ("HECM"). The HECM program aims to make reverse mortgages accessible to seniors by insuring lenders against any losses incurred in writing the reverse mortgages, provided the lender complies with the program's strict statutory and regulatory requirements.

3. As explained in detail below, Defendants manipulate the appraised values of properties for which they will be submitting HECM insurance claims, knowing that lower appraised values will help them recover *higher* insurance reimbursement from the government. Defendants' fraudulent scheme violates a host of statutory and regulatory provisions that are material to the government's reimbursement decision, results in false and inaccurate information being submitted on the mortgage insurance claim forms, and ultimately leads to false and fraudulent claims the government would not have reimbursed at the amounts that it did, if at all.

4. Defendants also submitted false and fraudulent information in their applications for HUD mortgage insurance of traditional mortgages obtained for the purchase of single family homes. Section 203(b) of the National Housing Act, as amended, 12 U.S.C. §§ 1707, *et seq.*, at § 1709(b), authorizes HUD to insure lenders against losses on mortgage loans made to buyers of single-family homes. This is commonly referred to as Federal Housing Administration ("FHA")

or HUD mortgage insurance. The HUD/FHA program is designed to help low-and-moderate-income families become homeowners by lowering or eliminating altogether certain costs associated with mortgage loans and by providing protection to lenders.

5. As explained in detail below, Defendants manipulate the appraised values of properties for which they are originating mortgage loans in order to satisfy their builder partners' desired sales price and keep a pipeline of mortgage loans flowing. By using inflated appraisals, Defendants cause the government to insure the mortgages at a higher amount, and consequently to pay more than it should on any resulting mortgage insurance claims.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 and 3730. Plaintiff establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).

7. Further, while no longer a jurisdictional requirement, under 31 U.S.C. § 3730(e), there has been no public disclosure within the meaning of § 3730(e)(4)(A) of the allegations Relator is asserting and Relator is an original source. Relator has direct and independent knowledge of the allegations contained herein.

8. This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C § 1391(b) and 31 U.S.C § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in, transact, or have transacted business in the Southern District of New York.

9. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact or have transacted business in the Southern District of

New York. At all times relevant to this Complaint, Defendants have regularly conducted substantial business within the Southern District of New York.

## III. PARTIES

10. Defendant Nationstar Mortgage Holdings Inc. is incorporated in Delaware and headquartered in Lewisville, Texas.

11. Self-described as "one of the nation's leading mortgage lenders," Defendant Nationstar Mortgage LLC is a wholly owned operating subsidiary of Defendant Nationstar Mortgage Holdings, Inc. It is also incorporated in Delaware and headquartered in Lewisville, Texas. Defendants Nationstar Mortgage Holdings Inc. and Nationstar Mortgage LLC are collectively referred to as "Defendants" or "Nationstar" throughout this Complaint.

12. Relator Scott Roberts has been a certified residential appraiser since 1993 and holds the highest residential designation available. Relator earned the SRA designation from the Appraisal Institute in 2011. Relator owned and operated his own appraisal business from 1994 to 2009. From December 2009 to January 2012, Relator worked as a Quality Assurance Manager at Valuation Management Group. From February 2012 to August 2013, Relator was employed as Chief Appraiser at MountainSeed Advisors. In his positions with Valuation Management Group and MountainSeed Advisors, Relator was tasked with reviewing appraisals ordered by his employers, and with overseeing daily operations of the appraisal review departments.

13. Relator joined Defendant Nationstar Mortgage LLC in its Irving, Texas office in August 2013 as a Review Appraiser, working primarily on properties with traditional (non-reverse) mortgages. His primary responsibility was to review appraisals ordered by Nationstar for reliability. In May 2014, Nationstar assigned Relator to the newly-formed Appraisal Review Department of its Reverse Real Estate Owned division, which is responsible for servicing the

company's reverse mortgages, including those insured by the federal government. Since his reassignment, Relator has been tasked with reviewing appraisals ordered by the Reverse REO division on properties for which Nationstar plans to submit mortgage insurance claims.

## IV. REGULATORY FRAMEWORK

### A. The Home Equity Conversion Mortgage Program

14. The Home Equity Conversion Mortgage ("HECM") program was originally authorized by the Housing and Community Development Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815 (1988); 12 U.S.C. § 1715z-20. Under the program, the United States government insures reverse mortgages originated by private lenders. The United States Department of Housing and Urban Development ("HUD"), in part through the Federal Housing Administration ("FHA"), administers the program and insures the loans. Congress created the FHA in 1934, and FHA became a part of HUD's Office of Housing in 1965.

15. A reverse mortgage is a loan that allows older homeowners to convert part of the equity in their homes into cash. It is the "reverse" of a traditional mortgage, in which the borrower repays the borrowed sum on a monthly basis: reverse mortgage borrowers receive money in exchange for their home equity. Borrowers, who are the mortgagors in the transaction, can choose to receive the loan proceeds in a lump sum, on a monthly basis, or they can draw on a line of credit periodically as needed. They are not required to make monthly or other periodic payments to repay the loan. Instead, the loan balance increases over time, and the loan does not become due and payable until one of a number of events occurs. 12 U.S.C. § 1715z-20(j).

16. The general purpose of the HECM program is "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing and subsistence needs at a time of reduced income." 12 U.S.C. §

1715z-20(a)(1). Most reverse mortgages, including the reverse mortgages that Nationstar originated, owns and/or services, are HECMs.

17. The HECM program originally was a pilot program that was permitted to insure up to 2,500 reverse mortgages. Subsequently, Congress made the program permanent and greatly expanded it. As of 2012, 740,000 loans had been originated under the program, and about 582,000 were still outstanding, according to data provided by the FHA. *See* Consumer Financial Protection Bureau: Reverse Mortgages, Report to Congress, June 28, 2012, http://1.usa.gov/L49Som (last visited Dec. 19, 2014).

18. HUD is the regulator and insurer of the HECM program, and is also a party to every HECM transaction. HUD issued the program's governing regulations, 24 C.F.R. § 206.1, *et seq.*, and interpretations of the regulations, which are found in HUD's Handbook, 4235.1 REV-1 (1994), Home Equity Conversion Mortgages, "Frequently Asked Questions," and in a series of mortgagee letters directed to private lenders and servicers participating in the program.

19. In order to participate in the HECM program and submit insurance claims, lenders are required to abide by the rules and regulations set out in the HECM statute, 12 U.S.C. § 1715z-20, *et seq.* and HECM regulations, 24 C.F.R. § 206.1, *et seq.*, and to follow guidance issued by HUD in its HECM Handbook, mortgagee letters, its online HECM Servicing "Frequently Asked Questions," and any additional regulations or laws referenced in these materials.

**B. <u>HECM Insurance Claims</u>**

20. HUD insures HECMs through the General Insurance Fund. 24 C.F.R. § 206.102; *see also* 12 U.S.C. § 1735c. The insurance guarantees that the borrower or his or her heirs will not owe more than the HECM balance if it exceeds the value of the property at the time the loan

becomes due and payable. The lender can make a claim to HUD/FHA for the difference between the mortgage balance and the value of the property. 24 C.F.R. § 206.123(a).

21. HECMs become due and payable when: (1) all homeowners die; (2) the property is sold; (3) the property is no longer the principle residence of the homeowner for reasons other than death; (4) the homeowner fails to occupy the property for longer than 12 consecutive months because of physical or mental illness; or (5) a breach of the mortgage agreement occurs. 24 C.F.R. § 206.27(c); 12 U.S.C. § 1715z-20(j). The maintenance of property taxes and homeowner's insurance are obligations of the mortgage, the breach of which can make the mortgage due and payable.

22. After a HECM becomes due and payable, HUD regulations set out a specific procedure for the disposition of the property and the filing of any mortgage insurance (MI) claims.

23. Once a mortgage is due and payable, "the mortgagee shall obtain an appraisal of the property." 24 C.F.R. § 206.125(b). It must also follow specific procedures for a foreclosure proceeding, and must bid on the property at the appraised value at the foreclosure sale. 24 C.F.R. § 206.125(b). If "[t]he mortgagee forecloses and a bidder other than the mortgagee purchases the property for an amount that is not sufficient to satisfy the mortgage balance, as provided in §206.125(e)," the mortgagee may file a mortgage insurance claims. § 206.123(a)(5).

24. If the mortgagee "acqui[res] the property by foreclosure or deed in lieu of foreclosure, the mortgagee shall take possession of, preserve and repair the property and shall make diligent efforts to sell the property within six months from the date the mortgagee acquired the property." Further, "[t]he mortgagee shall sell the property for an amount not less than the appraised value (as provided under [24 C.F.R. § 206.125(b)] of this section) unless written

permission is obtained from the Secretary authorizing a sale at a lower price." 24 C.F.R. § 206.125(g)(1). Once the lender acquires the property, the lender will refer to it as a "real estate owned" or REO loan.

25. Having acquired the property, the mortgagee may submit an MI claim if it "sells the property as provided in §206.125(g) for an amount which does not satisfy the mortgage balance *or* fails to sell the property as provided in §206.127(a)(2)." 24 C.F.R. § 206.123(a)(4). Based on which of these conditions apply, the mortgagee can file one of two different types of claims – a sale based claim ("SBC") or an appraisal based claim ("ABC"):

a. If the property sells within six months of the mortgagee acquiring the property, "[t]he mortgagee shall apply for the payment of the insurance benefits within 15 days after the sale of the property by the mortgagee. Application shall be made by notifying the Secretary of the sale of the property, the sale price, and income and expenses incurred in connection with the acquisition, repair and sale of the property." This is commonly referred to as a sale based claim, or "SBC". 24 C.F.R. § 206.127(a)(1).

b. "If the property will not be sold within six months from the date the mortagee [sic] acquired title, the mortgagee shall, at least 15 days prior to the expiration of the six month period, request the Secretary to cause another appraisal of the property to be made. Within 15 days of receipt of the appraisal, the mortgagee shall apply for the insurance benefits as provided in paragraph (a) of this section, substituting the appraised value for the sale price. The mortgagee shall bear the cost of the appraisal." 24 C.F.R. § 206.127(a)(2). This is commonly referred to as an appraisal based claim, or "ABC".

26. "The amount of the claim shall be computed by (i) totaling the mortgage balance, (including any accrued interest and [mortgage insurance premium] which have been added to the

mortgage balance) and any accrued interest which has not been added to the mortgage balance as of the due date (defined in the following sentence), and allowances for items set forth in paragraph (d)(2) of this section, and (ii) subtracting from that total the amount for which the property was sold (or the appraised value determined under §206.127(a)) and the items set forth in paragraph (d)(3) of this section." 204 C.F.R. § 206.129(d)(1).

27. Thus, § 206.129(d) allows a mortgagee to seek reimbursement for any portion of the unpaid balance not satisfied by the sale or appraisal price, plus additional costs incurred if identified in subpart (d)(2). Those additional costs include, in relevant part, "[e]xpenses in connection with the sale of the property including a sales commission at the rate customarily paid in the community…." 24 C.F.R. § 206.129(d)(2)(v)(C).

28. Reimbursement of these sale-related expenses is applicable only if there is an actual sale, and therefore applies to an SBC *but not an ABC*. "HUD will not reimburse the mortgagee for otherwise allowable expenses incurred after the reimbursement cut-off date, which (as defined in the Introduction to these instructions) for this claim type is: 1) the date of the deed conveying the property to the successful third-party foreclosure sale bidder; 2) the date within six months of the mortgagee's acquisition on which the mortgagee disposes of the property in accordance with FHA HECM requirements; 3) if the mortgagee does not sell the property within six months of its acquisition, the six-month anniversary of the mortgagee's acquisition." Mortgagee Letter 94-44, Claims Instructions for FHA-Insured Home Equity Conversion Mortgages (HECMs) (Sept. 29, 1994).

29. HUD's regulations establish a "maximum claim amount" that FHA will pay a mortgagee for each HECM. 24 C.F.R. § 206.3. If a mortgage approaches 98% of this maximum

claim amount, the lender may assign the mortgage to HUD, thereby protecting lenders from any uninsured liability. 24 C.F.R. § 206.107(a)(1).

30. Mortgage insurance claims are submitted on Form HUD-27011, which requires the mortgagee to provide all relevant information needed to calculate the insurance benefits to which it is entitled. The form includes an express certification: "[b]y signing below, the undersigned certifies that the statements and information contained hereon (face and reverse) are true and correct."

### C. Traditional Mortgage Insurance for Single-Family Homes

31. FHA provides mortgage repayment insurance to lending institutions. FHA's mortgage insurance programs help low-and-moderate-income families become homeowners by lowering some of the costs of their mortgage loans. FHA mortgage insurance also encourages lenders to make mortgages to otherwise creditworthy borrowers and projects that might not be able to meet conventional underwriting requirements, by protecting the lender against default on mortgages for properties that meet certain minimum requirements.

32. Section 203(b) of the National Housing Act is the centerpiece of FHA's single-family mortgage insurance programs. According to FHA, the One- to Four- Family Mortgage Insurance Program remains an important tool with which the federal government expands homeownership opportunities for homebuyers who would not otherwise qualify for conventional mortgages on affordable terms, as well as for those who live in underserved areas where mortgages are harder to get. These obligations are protected by FHA's Mutual Mortgage Insurance Fund.

33. Section 203(b) has several important features:

- *Downpayment requirements can be low.* In contrast to conventional mortgage products, which frequently require downpayments of 10% or more of the purchase price of the home, single-family mortgages

insured by FHA under Section 203(b) make it possible to reduce downpayments to as little as 3%. This is because FHA insurance allows borrowers to finance approximately 97% of the value of their home purchase through their mortgage, in some cases. As such, FHA requires that the loan-to-value ratio for a qualified loan be no greater than 97%.

– *Many closing costs can be financed.* With most conventional mortgages, the borrower must pay, at the time of purchase, closing costs equivalent to 2-3% of the price of the home. This program allows the borrower to finance many of these charges, thus reducing the up-front cost of buying a home.

– *HUD sets limits on the amount that may be insured.* To make sure that its programs serve low-and-moderate-income people, FHA sets limits on the dollar value of the mortgage. These figures vary over time and by place, depending on the cost of living and other factors (higher limits also exist for two-to-four-family properties).

34. To make FHA-insured Section 203(b) mortgages, lending institutions such as banks, mortgage companies, and savings and loan associations must receive approval by FHA.

35. Anyone intending to use the mortgaged property as their primary residence is eligible to apply for an FHA-insured mortgage through FHA-approved lenders. Applications for FHA mortgage insurance are made through an FHA-approved lending institution. Most lenders who use this mortgage insurance product, however, make their requests through a provision known as Direct Endorsement, which authorizes them to consider applications without first submitting paperwork to HUD.

## D. **HUD's Direct Endorsement Program**

36. HUD's Direct Endorsement program, incorporated into law in 1990, is the most common and fastest way for borrowers to obtain FHA-backed loans by allowing borrowers to obtain mortgage insurance directly from a HUD-approved lender. 24 C.F.R. § 203.5 (regulations for the DE program). The crux of the DE program is that it removes HUD from reviewing the

materials supporting applications for mortgage insurance. It places that task on lenders that have applied for and been approved by FHA for this unique responsibility.

37. Rather than reviewing the technical materials underlying insurance applications, FHA reviews certain forms submitted by the originating lender that contain required certifications of compliance with FHA requirements.

38. On November 17, 1995, HUD extended the DE program to HECM loans. Mortgagee Letter 95-54. The lender is required to follow all the same requirements in HUD Handbooks that describe the DE program, "except where inconsistent with the requirements of the HECM program," in addition to any requirements unique to the HECM program. *Id.*

39. Direct Endorsement is not a separate program; rather, it is the mechanism that enables FHA-approved lenders to consider single-family mortgage applications without first submitting paperwork to HUD.

40. During the period relevant to this action, virtually all single-family FHA mortgage lending was (and continues to be) done through Direct Endorsement.

41. A lender must be approved under HUD's regulatory procedures to issue insured mortgage loans under the Direct Endorsement program. 24 C.F.R. § 203.3(a); *see also* 24 C.F.R § 203.4. The lender must use a *bona fide* underwriter who is on its permanent staff and is registered with HUD. 24 C.F.R § 203.3(b)(2).

42. HUD imposes due diligence requirements on lenders' approved underwriters. "A Direct Endorsement mortgagee shall exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

43. Underwriters are required to be in "compliance with [the] guidelines" found in the Handbook No. 4155-2, which creates the "minimum standards of due diligence" in underwriting mortgages. 24 C.F.R § 203.5(c).

44. HUD's regulations provide that any "certification required by [FHA] shall specifically state that it has been made, presented, and delivered for the purpose of influencing an official action of the FHA, and of the Commissioner [of FHA], and may be relied upon by the Commissioner as a true statement of the facts contained therein." 24 C.F.R. § 200.62.

45. As pertinent to this case, HUD requires Direct Endorsement lenders to submit a number of properly completed forms and certifications with applications for mortgage insurance. 24 C.F.R. § 203.255(b).

a. Lenders must submit a "[p]roperty appraisal upon a form meeting the requirements of [HUD] (including, if required any additional documentation supporting the appraised value of the property . . .)." 24 C.F.R. § 203.255(b)(l).

b. Lenders also must submit an underwriter certification. This must state that the underwriter "has personally reviewed the appraisal report . . . and that the proposed mortgage complies with HUD underwriting requirements, and incorporates each of the underwriter certification items that apply to the mortgage submitted for endorsement, as set forth in the applicable handbook or similar publication that is distributed to all Direct Endorsement mortgagees . . . ." 24 C.F.R. § 203.255(b)(5).

c. In addition, lenders must submit a separate mortgagee certification. This must state that "the authorized representative or the mortgagee . . . who is making the certification has personally reviewed the mortgage documents and the application for insurance endorsement, and certif[ies] that the mortgage complies with [24 C.F.R. § 203.255(b)]." 24

C.F.R. § 203.255(b)(11). In addition, "[t]he certification shall incorporate each of the mortgagee certification items which apply to the mortgage loan submitted for endorsement, as set forth in the applicable handbook or similar publication that is distributed to all Direct Endorsement mortgagees." *Id.*

46. The Direct Endorsement program is further detailed in HUD Handbook No. 4155-2, "Lender's Guide to the Single Family Mortgage Insurance Process," which superseded HUD Handbook No. 4000.4 REV-1, "Single Family Direct Endorsement Program." *See* Mortgagee Letter 2009-14 (April 9, 2009). The newer handbook "incorporate[s] and consolidate[s] the guidance contained in the current Handbooks." *Id.*

47. "A DE lender *must* conduct its business operations in accordance with accepted sound mortgage lending practices...and all federal and state laws applicable to mortgage banking." HUD Handbook No. 4155-2 at § 2.A.1.b. A lender must apply to participate in the DE program, and it must have a written quality control plan to ensure compliance with all rules, regulations, and "other FHA issuances." *Id.* at § 2.A.2.b.

48. Each approved DE lender must have on its staff "a full-time employee" to serve as underwriter. The underwriter must be "a corporate officer with signatory authority (or otherwise authorized to bind the mortgagee in matters involving the origination of mortgage loans)" and only employed by one lender. HUD Handbook No. 4155-2, § 2.A.4.a HUD looks to the underwriter as the focal point of the Direct Endorsement program. The specially approved underwriter is commonly referred to as a "DE Underwriter" or "Direct Endorsement Underwriter." This DE Underwriter must be trained and supervised in compliance with HUD regulations and all relevant federal laws, as if a HUD-underwriter him or herself.

49. "The underwriter's role and responsibilities are critical elements of the Direct Endorsement (DE) Program, and FHA looks to the underwriter as its focal point." HUD Handbook No. 4155-2, § 2.A.3.

50. In exchange for the financial and other benefits of issuing HUD-insured mortgage loans, lenders provide HUD with certifications that they have underwritten the loans in strict compliance with HUD requirements. HUD leaves no doubt that it relies on the truthfulness of these certifications. The lenders' DE underwriter "must ensure reasonable conclusions, sound reports, and compliance with FHA requirements by reviewing appraisal reports and compliance inspections," and must make decisions regarding the "acceptability of the appraisal," among other responsibilities. HUD Handbook No. 4155-2, § 2.A.4.b. The lender's DE underwriter certifies on each loan application that he or she "has personally reviewed all application documents" and "finds compliance with the applicable requirements." HUD Handbook No. 4155-2, § 2.A.4.b.

**E. <u>Appraisal Regulations</u>**

51. Appraisals serve critical a function in the operation of mortgage origination and mortgage markets and, with respect to government funds, appraisals not only "determine the maximum insurable mortgage" but "protect the FHA insurance funds." 24 C.F.R § 200.200(b). The dangers of inaccurate appraisals, and of incentive structures to enable inaccurate appraisals, were made manifest in the recent housing crisis.

52. The appraised value of HECM properties is as integral to any insurance claims to HUD, whether a SBC or an ABC. If a SBC is made, the sale price is used to calculate the claim amount, but the property has to have sold for *at least* the appraised value (unless HUD makes a written exception). If an ABC is made, then the appraised value is directly used to calculate the claim amount. 24 C.F.R. §§ 206.125(g)(1), 206.127(a)(1)-(2).

53. For all HECM appraisals, HUD requires that "[t]he appraiser must perform the appraisal with the same standards and forms expected in an FHA single-family appraisal." HUD Reg. 4150-2 CHG-1, Valuation Analysis for Single Family One- To Four-Unit Dwellings, App'x B at B-2. Those standards, in turn, are set out in a number of statutes and regulations.

54. "The success of the FHA insurance program and HUD's ability to protect its financial interest begins with selecting qualified and knowledgeable appraisers." HUD Handbook No. 4150-2 CHG-1 at § 1-0. This is because "[f]or HUD, the purpose [of an appraisal] is to determine market value for mortgage insurance purposes." *Id.* at § 4-1(C). "Appraisals performed for HUD/FHA are not intended to protect the buyer: they protect HUD." *Id.* at § 5-l(B).

55. Congress established minimum appraisal standards: (1) appraisals "shall be performed in accordance with generally accepted appraisal standards," and (2) each appraisal be a written statement that is "independently an[d] impartially prepared by a licensed or certified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information." 12 U.S.C. § 1708(g)(l)(A), (B).

56. Congress also required HUD to "prescribe standards for the appraisal of all property to be insured by the Federal Housing Administration. Such appraisals shall be performed in accordance with uniform standards, by individuals who have demonstrated competence and whose professional conduct is subject to effective supervision." 12 U.S.C. § 1708(g)(l).

57. In 1990, Congress added standards to apply specifically to DE program appraisers. It required that appraisers comply with qualifications or standards established by

HUD, and that the individual responsible for the appraisal personally approve and sign the appraisal report. 12U.S.C. § 1708(g)(3)(B).

58. Congress also imposed restrictions on appraisal companies by requiring only specifically approved appraisers to perform appraisals for HUD-insured mortgages. For individuals who are employees of appraisal companies, only those persons who meet the qualifications or standards for appraisers and inclusion on appraiser fee panels established by HUD are eligible to conduct appraisals insured by HUD/FHA. 12 U.S.C. § 1708(g)(4).

**1. Appraiser Independence**

59. The law sets independence standards for appraisers involved in federally-regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.* It provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "'fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property or the transaction." 12 C.F.R. § 34.45.

60. In July 2008, Congress imposed additional restrictions on approved appraisers. Beginning on July 30, 2008, "any appraiser chosen or approved to conduct appraisals for mortgages under this title shall: (A) be certified (i) by the State in which the property to be appraised is located . . . or (ii) by a nationally recognized professional appraisal organization; and (B) have demonstrated verifiable education in the appraisal requirements established by the [FHA]." 12 U.S.C. § 1708(g)(5).

61. Additional appraisal requirements are stated in Section 129E of the Truth in Lending Act (TILA), which was enacted on July 21, 2010, as Section 1472 of the Dodd-Frank

Wall Street Reform and Consumer Protection Act. As noted in the Interim Final Rule promulgated under the new law, "TILA Section 129E establishes new requirements for appraisal independence for consumer credit transactions secured by the consumer's principal dwelling. The amendments are designed to ensure that real estate appraisals used to support creditors' underwriting decisions are based on the appraiser's independent professional judgment, free of any influence or pressure that may be exerted by parties that have an interest in the transaction." Interim Final Rule, Regulation Z, 12 C.F.R. § 226 (Oct. 28, 2010).

62. As finally promulgated, Regulation Z sets out "valuation independence" requirements for mortgages and reverse mortgages, and broadly prohibits any "attempt to directly or indirectly cause the value assigned to the consumer's principal dwelling to be based on any factor other than the independent judgment of a person that prepares valuations, through coercion, extortion, inducement, bribery, or intimidation of, compensation or instruction to, or collusion with a person that prepares valuations or performs valuation management functions." 12 C.F.R. § 226.42(c)(1).

63. The Uniform Standards of Professional Appraisal Practice ("USPAP") is incorporated into federal law, 12 C.F.R. § 34.44, and into FHA requirements. The USPAP require appraisers to conduct their appraisals independently. In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.

64. The Uniform Residential Appraisal Report ("URAR"), which is used for all appraisals of government-insured properties, contains a list of 25 express appraiser certifications. HUD has stated that "[o]f particular importance is the certification that the appraisal is not based

on any of the following: a requested minimum value[;] a specific value[; or] the approval of a loan as indicated." HUD Handbook 4150.2 CHG-1, § 5-l(A)(2). Additional certifications pertinent to this case are:

> 2. I performed a complete visual inspection of the interior and exterior areas of the subject property.
>
> 3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.
>
> 7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.
>
> 10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.
>
> 11. I have knowledge and experience in appraising this type of property in this market area.
>
> 15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.
>
> 16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.
>
> 18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

URAR at 5.

**2. <u>Prohibition on Appraisal Shopping</u>**

65. The federal government has set out to prevent appraisal value shopping, the practice of ordering multiple appraisals in order to obtain a desired value. *See* Mortgagee Letter

2009-29 ("FHA prohibits 'appraiser shopping,' where lenders order additional appraisals in an effort to" meet certain predetermined targets, such as, in the context of traditional mortgages, higher property values); HUD Handbook No. 4155-2, § 4.4.j (same). This policy is reflected in numerous regulations and certifications.

66. The URAR requires a certification by the appraiser that, "Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, *my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $__________, as of __________, which is the date of inspection and the effective date of this appraisal*" (emphasis added). Uniform Residential Appraisal Report ("URAR"), Freddie Mac Form 70 and Fannie Mae Form 1004 (March 2005), at 2.

67. "Market value" is defined as "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus." "Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) The buyer and seller are typically motivated[;] (2) Both parties are well informed or well advised, and each is acting in what they consider their best interest[;] (3) A reasonable time is allowed for exposure in the open market[;] (4) Payment is made in terms of cash in United States Dollars or in terms of a financial arrangement comparable thereto[;] [and] (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions." HUD Handbook 4150.2 CHG-1, § 4-l(A).

68. As noted above, the URAR also requires a "certification that the appraisal is not based on any of the following: a requested minimum value[;] a specific value[; or] the approval of a loan as indicated." HUD Handbook 4150.2 CHG-1, § 5-l(A)(2).

69. Regulations also prohibit obtaining multiple appraisals in an effort to obtain the ordering party's target or desired appraisal value.

a. "The underwriter may request reconsideration of the appraised value when *new* market data exists that may not have been reflected in the appraisal." HUD Handbook 4150.2 CHG-1, § 4-9 ("Reconsideration of Appraised Value") (emphasis added). If there is such a request, it must follow strict guidelines as well. "The lender can select new comparables and request a reappraisal. This request from the lender must be in writing and maintained in the appraiser's work file. The appraiser must decide whether to use the new comparables and perform the reappraisal. If the comparables were available when the initial appraisal was performed, the lender may not offer pay for the reconsideration." *Id.*

b. Regulation Z also prohibits mischaracterizing, falsifying, or altering a property's value, or inducing another to do so. 12 C.F.R. § 226.42(c)(2). Obtaining multiple valuations do not violate Regulation Z only if the purpose in doing so is "to select the most reliable valuation." 12 C.F.R. 226.42(c)(3)(iv).

c. "A Seller must not order, obtain, use, or pay for a second or subsequent appraisal in connection with a Mortgage financing transaction unless: (i) there is a reasonable basis to believe that the initial appraisal was flawed or tainted and such basis is clearly and appropriately noted in the Mortgage file, or (ii) such appraisal is done pursuant to written, pre-established bona fide pre- or post-funding appraisal review or quality control processes or underwriting guidelines, and so long as the Seller adheres to a policy of selecting the most

reliable appraisal, rather than the appraisal that states the highest value, or (iii) a second appraisal is required by law." Appraiser Independence Requirements, Fannie Mae (available at https://www.fanniemae.com/content/fact_sheet/appraiser-independence-requirements.pdf).

d. "When an institution identifies an appraisal or evaluation that is *inconsistent with the Agencies' appraisal regulations* and the deficiencies cannot be resolved with the appraiser or person who performed the evaluation, the institution must obtain an appraisal or evaluation that meets the regulatory requirements prior to making a credit decision. Though a reviewer cannot change the value conclusion in the original appraisal, an appraisal review performed by an appropriately qualified and competent state certified or licensed appraiser in accordance with USPAP may result in a second opinion of market value. An institution may rely on the second opinion of market value obtained through an acceptable USPAP-compliant appraisal review to support its credit decision." Interagency Appraisal and Evaluation Guidelines, 75 Fed. Reg. 77450-01 (emphasis added).

70. Prior to January 1, 2010, the validity period for appraisals of completed properties used for FHA-insured mortgages was six months. Beginning January 1, 2010, the validity period was changed to 120 days. Mortgagee Letter 2009-30. These lengthy validity periods reflect the well-accepted principle that a USPAP-compliant appraisal will accurately reflect market value.

### 3. **Appraisal Requirements in HUD Handbooks and Forms Applicable to Direct Endorsement Lenders**

71. The lender's approved Direct Endorsement Underwriter is responsible for determining that the property is acceptable for mortgage insurance. This includes the responsibility to review the appraisal report prepared by the staff or fee appraiser to determine eligibility, the maximum mortgage amount, and the acceptability of the conclusions reached by the appraiser. Handbook No. 4155-2, § 2.A.4.b.

72. HUD requires lenders to use only those appraisals that meet FHA requirements. 24 C.F.R. § 203.5(e)(l).

73. A lender is required to "ensure that an appraisal and related documentation satisfy FHA appraisal requirements," and "both [the lender and the appraiser] bear responsibility for the quality of the appraisal in satisfying such requirements." 24 C.F.R. § 203.5(e)(3).

74. A lender may use an appraiser only if he or she is listed on the FHA Appraisal Roster. 24 C.F.R. § 203.5(e)(l). In turn, appraisers listed on the FHA Appraiser Roster are responsible for obtaining, reading, and complying with the HUD Appraiser Handbook 4150.2, any updates, and "all other instructions and standards issued by HUD when performing all appraisals of properties for HUD single family mortgage insurance purposes." 24 C.F.R. § 200.206(a)-(c).

75. The Direct Endorsement Underwriter bas the responsibility to: comply with all HUD instructions; review appraisal reports to ensure reasonable conclusions, sound reports, and compliance with HUD requirements; make final decisions relating to the acceptability of the appraisal and the overall acceptability of the mortgage loan for HUD insurance; remaining aware of the warning signs that may indicate irregularities, detecting fraud, and making underwriting decisions with due diligence in a prudent manner. HUD Handbook No. 4155-2, § 2.A.4.b.

76. The lender provides the assigned appraiser a Uniform Residential Appraisal Report ("URAR") and a Form HUD-92800.5B (Conditional Commitment, Direct Endorsement, Statement of Appraised Value). HUD Handbook 4155-2, §§ 8.B.2.b, 4.4.c. After completing the URAR, the appraiser returns it to the lender's underwriter. HUD Handbook 4150.2 CHG-1, § 1-2(C). The underwriter reviews it and, if proper, submits it to FHA with the mortgage insurance. HUD Handbook No. 4155-2, § 8.B.2.b.

77. The mortgagee is also required to execute Form 92900-A, HUD/VA Addendum to Uniform Residential Loan Application. "[T]o induce the Department of Housing and Urban Development - Federal Housing Commissioner to issue a firm commitment for mortgage insurance," the mortgagee "certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that a Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program."

78. On that same form the DE Underwriter separately "certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."

79. HUD ensures that the lender and its authorized underwriter signed all required certifications. Under the DE program, HUD does not conduct an independent review of the accuracy of the certifications, but instead relies on the truthfulness of the lender and its authorized underwriter.

## V. FACTUAL ALLEGATIONS

### A. Nationstar is a Large and Important Player in the Mortgage Industry.

80. Nationstar characterizes itself as "a leading residential mortgage loan servicer and one of the largest non-bank servicers in the United States as measured by aggregate unpaid principal balance of loans serviced. Our servicing portfolio consists of over 2.3 million loans with an aggregate unpaid principal balance of $390.7 billion as of December 31, 2013. We service mortgage loans in all 50 states, and we are licensed as a residential mortgage loan servicer/originator and debt collector in all states that require such licensing. In addition to our

core servicing business, we currently originate primarily conventional agency (Fannie Mae and Freddie Mac, collectively the government-sponsored enterprises or GSEs) and government (Federal Housing Administration and Department of Veterans Affairs) residential mortgage loans, and we are licensed to originate residential mortgage loans in all 50 states and the District of Columbia. Nationstar 2013 Annual Report at 9.

81. Nationstar has grown rapidly, with now nearly 7,000 employees and, as noted above, millions of customers across the country. Nationstar's 2013 annual revenue of well in excess of $1B represented a nearly 300% increase over 2012, and a 500% increase over 2011.

82. Whereas Nationstar has come under criticism and scrutiny for its practices in the mortgage industry, upon information and belief Relator is presenting direct, independent, and previously undisclosed information about the specifics of appraisal fraud.

83. One example of this scrutiny is a pending investigation in New York (one of the states where Nationstar has the largest presence). On March 5, 2014, New York State's Department of Financial Services (NYDFS) opened an investigation into Nationstar's mortgage practices. NYDFS Superintendent Benjamin Lawsky asserted, among other things, that NY had "received hundreds of complaints from New Yorker consumers about [Nationstar Mortgage LLC's] mortgage practices, including problems related to mortgage modifications, improper fees, lost paperwork, and numerous other issues."

84. Nationstar is active in both the HECM (reverse) and traditional mortgage markets.

**B. <u>Nationstar's Entry Into the HECM Market</u>**

85. In 2012, Nationstar acquired the servicing rights of approximately $28.4 billion in unpaid principal balance of reverse mortgage loans. It purchased these portfolios from Bank of America and MetLife. In May 2013, it acquired Greenlight Financial and its HECM portfolio, allowing Nationstar to become both an HECM servicer and originator. In June 2014, however,

Nationstar announced that it would exit the HECM origination market and would focus on servicing.

86. As of December 31, 2013, Nationstar's maximum unfunded advance obligation related to these reverse mortgage loans was approximately $4.4 billion, and its reverse mortgage servicing portfolio amounted to $28.9 billion in unpaid principal balance, which constitutes 7.4% of its entire servicing portfolio. 2013 Annual Report at 10, 11, 63. Its reverse mortgage servicing portfolio includes loans issued pursuant to the HECM program, and that are owned or insured by Fannie Mae and Ginnie Mae. 2013 Annual Report at 11.

87. Servicing reverse mortgage loans involves monitoring the condition of the property, advancing delinquent taxes and insurance, advancing line of credit draws, and dealing with foreclosure and recovery in the event of default. In addition, Nationstar's Solutionstar business unit offers asset-management, processing, title, settlement, valuation and appraisal services. 2013 Annual Report at 44.

88. In 2013, Nationstar generated $55 million in reverse mortgage service fees, up from $46 million in 2012. 2013 Annual Report at 48.

89. In servicing HECM properties that are in REO status, Nationstar sometimes works through Champion Mortgage, which is owned by Nationstar, Carrington Property Services, and SingleSource Property Solutions. For any such properties, Nationstar asset managers and staff direct the work of these other entities, and Nationstar applies and enforces the same false and fraudulent appraisal practices described herein.

### C. <u>Nationstar's Scheme to Fraudulently Maximize Government Reimbursements for HECM Properties Through Appraisal Shopping Practices</u>

90. When servicing due and payable HECMs on REO properties, Nationstar violates appraisal procurement and appraiser independence regulations in order to obtain depressed

appraisal values that help it sell the properties within six months, enabling it to submit mortgage insurance claims as SBCs instead of ABCs.

91. Nationstar strongly prefers SBCs because they provide significantly greater MI reimbursements over ABCs. Indeed, Nationstar developed a spreadsheet that calculates the difference in MI reimbursement between the two methods. In an October 28, 2014 email to Relator, Kelly Fengler, Reverse REO Assistant Vice President, explained that "in general the savings for the SBC over an ABC sale is the closing costs and commissions that are not reimbursed by HUD…so, if you multiply the value by 9%, that would be you savings for an SBC over an ABC."

92. At the same time, because Nationstar knows that HUD will insure any losses, subject to the maximum claim amount, Nationstar is not harmed by forcing the appraised values down in order to prompt quicker sales. In other words, Nationstar is made whole through the combination of the sale and the government's insurance claim, *and* it recovers closing costs from the government, all while the government is forced to pay more on the insurance claim than it would have absent Nationstar's false and fraudulent appraisal procurement and shopping practices.

93. As described below, to effectuate its goal of achieving sales within the 6-month claims window, Nationstar (a) encourages use of REO properties as comparables in appraisals in order to derive lower valuations, (b) until very recently, required listing agents to be present when appraisals were conducted in order to pressure appraisers into valuing the properties consistently with the typically incomplete and inaccurate broker price opinions ("BPOs"), (c) rates appraisers based, in part, on how quickly their properties sold with the stated intent of routing assignments to higher rated appraisers, and (d) orders new appraisals without identifying

any basis to do so in an effort to obtain lower valuations. Lower valuations, in turn, always worked to Nationstar's benefit, because they prompt quicker sales and additional government reimbursement for closing costs, while the difference between the loan balance and the depressed valuation is covered by HUD's mortgage insurance.

94. When Nationstar submits a mortgage insurance claim on a property that has a depressed appraisal value by virtue of its false and fraudulent appraisal practices, it causes financial harm to the government in multiple ways.

a. First, if HUD knew that the claimant incorporated artificially depressed and inaccurate appraisal values, and/or that violate the appraisal regulations and certifications described above, HUD would not pay the claim.

b. Second, even if HUD would pay the MI claim, whether a SBC or an ABC, the depressed appraisal value falsely increases the base insurance amount, because the claim will either be submitted with the depressed appraised value (ABC), or with a sale value that is lower because of the depressed appraised value (SBC).

c. Third, where a property with a depressed appraisal value sells before the 6-month claim deadline, the resulting SBC claim includes closing costs, typically 9% of the sales price. Even if HUD would ultimately pay the MI claim, it would not reimburse for costs for which Nationstar is eligible, in part or in whole, because of appraisals values that are false and inaccurate, and/or the result of false and fraudulent appraisal practices.

### 1. **Nationstar keeps appraisal values low by manipulating the appraisal process and pressuring appraisers.**

95. Nationstar has engaged in common policies to ensure appraisal values are artificially low.

96. Nationstar's engagement letter to appraisers expressly prioritized Nationstar's goal of selling the property before the 6-month claim deadline. The letter states that the "purpose of [the appraisal] report is to provide a reasonable AS-IS value in order that the client will be able to sell the property for that value within 6 months of acquiring the asset." This expressly contradicts the relevant regulations, which state that "[f]or HUD, the purpose [of an appraisal] is to determine market value for mortgage insurance purposes." HUD Handbook 4150.2 CHG-1, §§ 4-1(A) and (C).

97. This engagement letter also stated that while "the use of either non-REO or REO sales are acceptable," the "use of REO comparables is preferred." This runs starkly contrary to the actual purpose of the appraisal, which is to establish the market value as defined in HUD Handbook No. 4150.2, not a market value that is a function of comparisons to REO properties. Indeed, in setting guidance for HUD's own REO properties, HUD expressly reminds lenders and appraisers that "in developing an opinion of market value, REO sales and [pre-foreclosure] sales transactions should not automatically be chosen as comparables." Mortgagee Letter 2013-44. Doing so effectively depresses the market value, which was Nationstar's aim.

a. As one example, for a property located in Shelby, North Carolina, loan number 1087846, the appraiser notes that the "request was for REO market value," and "[t]hat is what is reflected in the report." Even where the appraiser did not receive an express request for REO market value, however, Nationstar's engagement letter effectively sought that.

b. Likewise, for a property located in Cooperstown, New York, loan number 1002358-8, the property asset manager expressly requested that the appraisal include REO sales as a comparable. The appraiser ultimately complied, even though the property was not a true comparable due to its distance from the subject property and lot size.

98. In addition, until very recently, Nationstar required that the lender's listing agent to be present when an appraiser inspected a property. As the appraiser engagement letter stated, "[t]he agent must be present as this is a client [Nationstar] requirement."

99. This requirement has the effect of pressuring the appraiser to attain values desired by Nationstar, via the listing agent, who typically prepares broker price opinions ("BPO") for Nationstar. A BPO, in those states where its use is legal, is generated by the listing real estate agent that is hired by the lender, and is the agent's estimate of the amount the property will sell for. It is not a valuation. Like the lender/mortgagee, the agent has an interest in quickly selling the property, both to obtain a commission and to continue receiving listings from Nationstar. No HUD regulation permits BPOs to stand in for appraisals, given this inherent bias. Indeed, in the mortgage origination context, Congress has affirmatively limited the use of BPOs. 12 U.S.C § 3355 ("broker price opinions may not be used as the primary basis to determine the value of a piece of property for the purpose of a loan origination of a residential mortgage loan secured by such piece of property.").

100. Not surprisingly, in part because of the requirement that the listing agent be present at appraisals, not only were initial appraisals typically depressed, but as discussed in the next section, the repeated appraisals of a Nationstar REO property brought the appraised value very close to the BPO.

101. The engagement letter was revised in approximately October 2014 to remove the requirement that listing agents be present, but the letter continues to stress a preference for REO properties and Nationstar's goal of selling the property within 6 months.

102. Nationstar also monitored appraisers for their ability to provide values that are acceptable to the company, and attempts to route appraisals to those preferred appraisers.

Nationstar went so far as to formalize this process in a "valuation scorecard" it developed in the Fall of 2014. Pursuant to these scorecards and Nationstar's informal practices before this time, appraisers are rated in part based on whether their appraisals helped properties sell before the 6-month claims deadline. At two meetings in or about September 2014 attended by Relator, his direct manager Steve Safavi, Assistant Vice President Fraud Department, Kelly Fengler, Reverse REO Assistant Vice President, and Richard Rice, Senior Vice President, Reverse Mortgage Servicing, Mr. Rice advocated for Nationstar's practice of scoring appraisers based on sales time, and advocated routing orders to appraisers with better scores.

103. For example, in requesting a follow-up appraisal for a property located in Glade Spring, Virginia, loan number 826267, Nationstar and its agents expressly requested "the same appraiser as the one [sic] completed report dated 08/07/14." Notably, the requested appraiser had previously reduced the value from $80,000 and $107,000 (as indicated on the first two appraisals) to $43,700.

104. Moreover, prior to the formation of the Appraisal Review Department for the Reverse REO Department in May 2014, Nationstar would pressure appraisers to revise values down, whether or not there was a legitimate basis to make such a request, in violation of section 129E(c) of TILA. 15 U.S.C. 1639e(c). Relator recalls viewing written communications to this effect from employees at Nationstar and its affiliated entities, including Gary Smith of SingleSource Properties. In some instances, appraisers noted the substance of these improper requests in their reports.

105. Together, these practices resulted in depressed appraisal values. Relator noticed numerous instances, including the examples below, where appraisals came in significantly lower than the initial BPO, a strong indication that the appraiser undervalued the property:

a. For a property located in Portsmouth, Virginia, loan number 1016751, the initial BPO of $70,000 exceeded the initial appraisal of $61,000.

b. For a property in Sun Valley, Nevada, loan number 803330, the initial BPO of $75,900 exceeded the initial appraisal of $73,000.

c. For a property in Federal Way, Washington, loan number 804744, the initial appraisal and initial BPO matched exactly at $62,000, and after the BPO was updated to $54,000, the appraisal decreased to $45,000.

d. For a property in Klamath Falls, Oregon, loan number 812562, the initial BPO of $185,000 exceeded the initial appraisal of $175,000.

e. For a property in Hot Springs, Arkansas, loan number 809109, the initial BPO of $95,000 exceeded the initial appraisal of $79,000.

f. For a property in Ashland, Kentucky, loan number 1027415, the initial BPO of $92,000 exceeded the initial appraisal of $90,500.

g. For a property in Reform, Alabama, loan number 825940, the initial BPO of $38,000 exceeded the initial appraisal of $20,000.

106. As a matter of corporate policy, even where an appraisal was lower than the BPO or had other signs of being too low, Relator and his colleagues were not to investigate or challenge the appraisal, as discussed in the next subsection. This is because Nationstar was seeking lower values that would help the properties sell, and did not care to question defects that worked in favor of this goal.

### 2. Nationstar orders multiple appraisals over short periods of time in order to obtain lower valuations and prompt sales within six months.

107. Attempting to generate depressed values in the initial appraisal is only the first step of Nationstar's fraudulent appraisal practices. If the initial appraisal is deemed too high

compared to the BPO, Nationstar orders additional appraisals at will in order to achieve a more desirable valuation, in complete disregard of the 120-day appraisal validity period or the prohibitions on appraisal shopping.

108. Tellingly, although appraisers are professionals with a wide array of tools at their disposal to ensure accurate valuation, the final appraisals inevitably closely match the notoriously problematic BPOs for the property.

109. The regulations described above provide strict, consistent, and internally-reinforcing guidance on the timing of appraisals after a HECM becomes due and payable, up to and including the mortgage insurance claim deadline that passes 6 months after the mortgagee acquires title.

a. The mortgagee, typically the lender or servicer, shall perform an appraisal once the HECM is due and payable. 24 C.F.R. § 206.125(b). Like all appraisals, this initial appraisal must comply with appraiser independence requirements and must not seek a particular target or valuation.

b. The initial appraisal is valid for 120 days. Mortgagee Letter 2009-30. After 120 days, the mortgagee should conduct a second appraisal.

c. If the property will not be sold within six months of acquiring title, the mortgagee shall request a final appraisal *at least* 15 days prior to the expiration of the six-month period. 24 C.F.R. § 206.127(a)(2) (emphasis added). As a second appraisal conducted at the 120-day mark is still valid at the conclusion of the 6-month claims deadline (Mortgagee Letter 2009-30), nothing prohibits the Secretary from permitting use of the second appraisal as the final appraisal requested under section 206.127(a)(2). Thus, absent some documented defect in an

appraisal that would warrant a subsequent appraisal, the mortgagee should only obtain two (or, in some circumstances, three) appraisals during the 6-month claim period.

110. Despite these longstanding and clear regulations, when it entered the HECM servicing market in 2012, Nationstar had no written guidelines for the review and reordering of appraisals. As Ms. Fengler explained in a November 20, 2014 email, the longstanding practice at Nationstar's Reverse REO division had been to simply order another appraisal every time an appraisal came in over Nationstar's initial list price. More generally, the Reverse REO division had no limitations on the number of appraisals or the frequency with which they were ordered.

111. In May 2014, Relator was informed by Steve Safavi that, despite Nationstar's aggressive appraisal practices aimed at reducing the appraised values, CEO Jay Bray and Executive Vice President and Chief Risk Officer Ramesh Lakshminarayanan were still dissatisfied with the number of reverse REO properties being sold outside the 6-month claims window, thereby forcing Nationstar to submit ABCs instead of higher reimbursement SBCs to the government. The executives tasked Mr. Safavi with overseeing an Appraisal Review Department for the Reverse REO division ("Reverse ARD"), which would focus on finding additional ways to decrease the appraisal values of reverse REO properties. Mr. Safavi, in turn, assigned Relator to the Reverse ARD. In August 2014, Mr. Safavi also assigned another Nationstar Review Appraiser, Jonathan Green, to the departmenet.

112. The Reverse ARD's assignment was to challenge appraisals on any conceivable basis in order convince appraisers to decrease the values. Any time an initial appraisal exceeded the BPO by 5% or $5,000, the Reverse ARD was asked to review the appraisal. In approximately September 2014, the department began reviewing all appraisals to find reasons for challenging the values.

113. Despite instructions to closely scrutinize all appraisals, Relator estimates that the Reverse ARD only finds legitimate challenges to approximately 20% of appraisals. The department has success in convincing appraisers to decrease their valuations for this subset. Part of the success is due to pressure appraisers feel to accept Nationstar's suggestions, given that Nationstar is an important source of work.

114. At the same time, Relator has been repeatedly instructed *not* to challenge appraisals that were less than the BPO or otherwise appear too low, even if they had identifiable defects, a practice which continues today. For example, in an email dated October 8, 2014 about a reverse REO property in Cleburne, Texas, Relator told Stacy Dowell, Reverse REO Oversight Manager, that an appraisal came in that was too low. Ms. Dowell directed Relator not to challenge the appraisal, per the company's continuing policy.

115. Notably, of all the appraisals he reviewed since joining the Reverse ARD, and based on his extensive experience as an appraiser, Relator recommended a *new* appraisal on an exceedingly small percentage of properties, less than 5%.

116. Yet, in parallel with the Reverse ARD's work in trying to persuade appraisers to decrease their estimates, the Reverse REO division, led by Ms. Fengler, continued to order appraisals at will and without regard to any of the regulations and requirements outlined above. In other words, even if the Reverse ARD did not recommend a new appraisal, the Reverse REO division would do so if it was unsatisfied with the appraisal value, just as it had done before the Reverse ARD was formed.

117. Relator participated in weekly meetings from approximately July to October 2014 where the dominant topic was REO sales times. Typically, Ms. Fengler and others from the Reverse REO division would continue to demand ways to achieve reductions in appraisal values

and follow-up appraisals, with little regard to warnings from Mr. Safavi and Relator about the impropriety of these practices. Ms. Fengler would also stress the ongoing pressure from management to sell properties within the 6-month claims window so that the MI claim could be submitted as a SBC. Indeed, Ms. Fengler would circulate a weekly report which detailed all the properties that had been in reverse REO status for between four and six months and were therefore viewed at risk of lapsing into "ABC status." Often, Nationstar would accelerate its appraisal orders for these properties.

118. Over time, Relator began expressing concern to Mr. Safavi that Nationstar's appraisal practices were deeply out of compliance with best practices and federal regulations. Mr. Safavi echoed these worries, and since May 2014, has repeatedly told Relator that if HUD knew of Nationstar's practices, it would fine Nationstar for value shopping, a complete lack of quality control, and for not having appropriate, written procedures for ordering new appraisals.

119. Similarly, in a meeting in or about August or September of 2014 with Steve Safavi and Richard Rice, Mr. Rice stated that he would not want to explain to HUD all of the properties with multiple appraisals ordered. At the meeting, Mr. Rice also had in hand examples of properties with four or more appraisals, and noted that there was no documentation supporting the need for new appraisals. Relator recalls that the meeting participants openly called the practice "appraisal shopping."

120. Relator also met with Mr. Safavi and Richard Gilmartin, Senior Vice President, Loan Administration, in September 2014. Mr. Gilmartin expressed concern that properties continued to sell outside the 6-month SBC window, and that the number of ABC properties was increasing since the Reverse ARD began its work in May 2014. Mr. Safavi attempted to explain that the valuations were not to blame, and that Nationstar's appraisal practices were problematic.

Mr. Gilmartin's ultimate message was to find a way to reverse the trend and get more properties sold within the 6-month window, echoing and reinforcing Nationstar's longstanding goal.

121. Eventually, Relator's and Mr. Safavi's expressions of concern regarding Nationstar's practices prompted a meeting on October 31, 2014 with Relator, Jonathan Green, Steve Safavi, Kelly Fengler, and Mary Riski, Vice President of the Reverse Division. Ms. Riski acknowledged that Nationstar repeatedly orders subsequent appraisals when the prior appraisal value is greater than the BPO, but not when the appraisal is less than the BPO. Ms. Riski recognized that this pattern was highly questionable and would be suspicious to HUD if it knew. Ms. Riski even suggested that Nationstar push a few sales through based on the higher appraisals and file them as ABCs if necessary, and that Nationstar create a record of questioning some high appraisals, all to create the appearance that Nationstar was even-handed and properly focused on market value, as required by HUD regulations. At the meeting, Ms. Fengler responded to these concerns by noting that there had been no problems yet. In response, Ms. Riski said that problems with HUD were inevitable given the scope of the problem.

122. At about the time of the October 31, 2014 meeting, Nationstar attempted for the first time to formalize its appraisal practices in a document titled "Reverse Mortgage REO Appraisal Procedures." In it, Nationstar recognizes its responsibility to follow appraisal independence requirements and the Uniform Appraisal Dataset. The document recites key aspects of appraiser independence, including that the appraiser must not be biased and must not include any predetermined opinions and conclusions.

123. The Appraisal Procedures document also notes that Nationstar "must order appraisals in accordance to HUD Reverse Mortgage specific timing requirements for a maximum of three appraisals in the Sales Based Claim population." It also ostensibly prohibits staff "from

ordering multiple consecutive appraisals in short time spans unless a new event has occurred which would warrant a new appraisal," such as a "status change from Foreclosure to REO; an Exception provided by HUD; Significant market decline, market crash or natural disaster; Previous appraisal was proven to be unreliable upon review by the Nationstar Appraisal Review Department."

124. Also, following the October 31, 2014 meeting, requests for new appraisals are supposed to be approved by Mr. Safavi.

125. Despite finally expressly acknowledging these requirements, Nationstar's appraisal procurement process remain defective in the ways described in this Complaint, as demonstrated by some of the examples outlined in the next section. In Relator's experience, the new requirements are not consistently followed in the Reverse REO division, and the company continues to prioritize selling the properties quickly over complying with federal laws and regulations. As Ms. Fengler noted in a November 20, 2014 email complaining about appraisals that were too high, executive management continues to put pressure on the REO Department to keep properties from "rolling to the ABC bucket."

**D. Examples of Nationstar's Appraisal Shopping for HECM Properties**

126. Relator has documented numerous examples where Nationstar ordered repeated appraisals in order to drive the appraised value down, which resulted in greater MI reimbursement from the government than it was actually owed. Tellingly, the final appraised value typically approximates the broker's price opinion ("BPO"). In many circumstances, Nationstar has already submitted mortgage insurance claims to the government on HUD Form 27011 or its electronic equivalent. For the others, Nationstar inevitably will submit such a claim, which is due within six months of Nationstar acquiring the property.

127. Having obtained multiple appraisals, Nationstar fails to advise HUD/FHA of *all* of the valid, unexpired appraisal values at the time Nationstar submits its MI claim; instead, it only submits the latest value, which is almost always the lowest. Nationstar also fails to inform HUD/FHA of the circumstances under which the multiple appraisals were ordered.

128. For a property located in Poughkeepsie, New York, loan number 1008092, Nationstar received an initial appraisal of $100,000 in July 2013. Three months later (and therefore within the validity period of the first appraisal), in October 2013, Nationstar ordered a second appraisal, which returned a value of $95,000. Unsatisfied with the reduction, it ordered a third appraisal one month later, in November 2013, which returned a value of $71,000. It ordered yet another appraisal in December 2013, and received a value of $71,000 again. At this depressed valuation, the property sold on February 14, 2014 for $75,000, and Nationstar submitted a SBC on the property. A Nationstar employee noted in the property file that "the loss is still $3K less for an SBC sale," an express recognition of Nationstar's effort to push sales before the 6-month claims deadline in order to increase its reimbursement from the government.

129. For a property located in Altamont, New York, loan number 1034846, Nationstar obtained an initial appraisal of $115,000 on June 27, 2014, substantially higher than the BPO of $98,000. Forty-six days later, on August 12, and without identifying any defects in the initial appraisal, Nationstar ordered a second appraisal which resulted in a value of $75,000, representing a 35% decline in FMV in that short period of time. This depressed value prompted a sale for $75,000 a few weeks later, on September 8. Nationstar submitted a SBC on the property.

130. For a property located in Boca Raton, Florida, loan number 1037294, Nationstar ordered three appraisals over the course of 17 days in order to drive the value down and quickly

effectuate a sale. It obtained an initial appraisal of $300,000 on February 24, 2014. Without identifying any defects in the first appraisal that would call into question its valuation, Nationstar obtained another appraisal ten days later on March 6, which valued the property at $305,000. Unsatisfied, Nationstar ordered another appraisal a week later on March 13, and succeeded in driving down the value to $280,000 – not coincidentally, the BPO for the property. The property then sold for $241,000 on December 9, 2014. Nationstar submitted an ABC to the government on this property.

131. For a property located in Virginia Beach, Virginia, loan number 1020342, Nationstar obtained an initial appraisal of $260,000 on March 25, 2014. Based on an assessment that one improper comparable property had been used in the initial appraisal, Nationstar authorized a second appraisal, which determined a value of $246,500 on May 19. Thereafter, Relator authorized a third appraisal based on the property's "days on market" ("DOM") and the DOMs of comparable properties listed in the prior appraisal. The third appraisal came back on July 15 with a value of $240,000. Thereafter, when it came time to order the final appraisal before the claim due date, Nationstar insisted on using the appraiser that derived the lowest appraised value of the prior three. Not surprisingly, that September 30 appraisal came back with a substantially lower value of $215,000 that matched the BPO exactly, even though Nationstar had already decreased the value with two prior revisions. Thus, over the course of five months, Nationstar's appraisal shopping and appraiser selection practices dropped the home's FMV by $45,000 or 17%. The house went under contract on November 13, 2014 for $215,000, and Nationstar submitted a SBC on the property.

132. For a property located in Middle River, Marlyand, loan number 1101505, Nationstar received an initial appraisal of $163,000 on February 11, 2014, which exceeded the

initial BPO of $150,000. In assigning the property to the listing agent, Nationstar made clear that "the client [Nationstar] does require the listing agent to be present when the appraiser inspects the property." Within 22 days, on March 5, 2014, and without documenting any defect in the initial appraisal, Nationstar had obtained a second appraisal which reduced the value by almost $30,000 to $135,000. Just over two months later, on May 11, it obtained a third appraisal, which further reduced the value to $125,000, again without documenting any defects in the prior appraisals. Less than two months after that, it ordered a fourth appraisal, bringing the value down to $110,000 on June 30. Still unsatisfied, it ordered a fifth appraisal 38 days later on August 7, further reducing the value to $91,000, which was less than the revised BPO of $95,000. Thus, in the span of 177 days, the appraised value of this home tanked from $163,000 to $91,000 – a dramatic 44% decrease – all while bringing the appraised values in line with the BPOs, even after a significant reduction in the BPO. Not long after the final appraisal, the property sold for $95,100 on September 25, 2014. Nationstar submitted a SBC to the government on this property.

133. For a property located in Petersburg, Virginia, loan number 1019767, Nationstar obtained an initial appraisal of $113,000 on May 9, 2014, exceeding the initial BPO of $100,000. In assigning the property to the listing agent, Nationstar made clear that "the client [Nationstar] does require the listing agent to be present when the appraiser inspects the property." Thereafter, Nationstar obtained four more appraisals. It ordered the second one the day the first one was completed on April 25, and obtained a significantly lower value of $82,000. Less than month later, on May 22, without identifying any defects in the prior appraisals, it sought a third appraisal and again obtained a value of $82,000. On August 8, without identifying defects in any of the prior appraisals, it obtained a fourth appraisal that brought the value to $105,000. Not

satisfied with the increased value, which not coincidentally approximated the initial appraisal, Nationstar sought a fifth and final appraisal on September 23 that pushed the value down to $68,000, which was less than the revised BPO of $80,500 delivered on July 22, 2014. The home then sold for $69,500 on November 20, 2014, and Nationstar submitted an ABC claim on the property.

134. For a property located in China Grove, North Carolina, loan number 1048761, Nationstar obtained an initial appraisal on July 9, 2014 that valued the home at $72,500 – substantially higher than the BPO of $43,000. Nationstar sought to challenge the appraisal, but the appraiser did not agree with its objections. Thus, on July 22, Nationstar simply ordered another appraisal and succeeded in bringing the value down to $30,000, even less than the BPO. The property sold for $38,900 on September 16, 2014. Nationstar submitted an SBC to the government on the property.

135. For a property located in Puyallup, Washington, loan number 831791, Nationstar obtained an initial appraisal of $185,000 on July 11, 2014, substantially higher than the BPO of $150,000. Nationstar challenged the appraisal in August, but the appraiser disagreed, and Relator noted that he largely agreed with the appraiser's view. Neverthless, shortly thereafter, on August 29, Nationstar ordered another appraisal, which took the value down to $175,000. Still unsatisfied, on September 19, it obtained yet another appraisal, which returned a value of $135,000, below Nationstar's BPO target. Not surprisingly, at this depressed value, the home sold for $140,000 on October 15, 2014. Nationstar submitted a SBC to the government on the property.

136. For a property located in Columbus, Ohio, loan number 1054325, Nationstar obtained an initial appraisal of $124,000 on May 6, 2014, substantially higher than the BPO of

$85,000. Nationstar disputed the appraisal, and eventually ordered a second one on June 2, less than a month after getting the first, and obtained the valuation of $72,000 on June 12. Nationstar sold the property for $69,000 on November 20, 2014, and submitted an ABC to the government on the property.

137. For a property located in Buchanan, Michigan, loan number 1039813, Nationstar obtained an initial appraisal of $110,000 on January 23, 2014, lower than the BPO of $120,000. Nationstar did not seek to have the appraisal value increased despite the disparity with the BPO. On April 8, 2014, it obtained another appraisal that valued the home at $100,000. Then, Nationstar ordered a third appraisal on May 30 that provided a valuation of $35,000, representing a dramatic 68% decline in FMV in a short five months, and bringing the home value well below even the revised BPO of $74,000. The property then sold for $35,000 on July 9, and Nationstar submitted a SBC on the property.

138. For a property located in Crawford, Texas, loan number 1018867, Nationstar sold the property for $100,000 on April 12, 2103, using an appraised value of $102,000. However, that appraised value was "based on a client-imposed restricted marketing time of 90-120 days," versus the required as-is value without marketing time restrictions. The HUD-compliant as-is value was actually $112,000, according to the same appraisal. Thus, Nationstar sold the property for a value below the actual appraised value, in violation of 24 C.F.R. § 206.125(g)(1). Nationstar submitted a SBC on the property using the $102,000 sales price.

139. For a property located in Green Valley, Arizona, loan number 827164, Nationstar sold the property for $117,000 based on an outdated appraisal of $120,000, even though it had in hand an updated appraisal valuing the property at $130,000. Nationstar submitted a SBC based on a sales value that was not supported by the latest appraisal.

140. In addition to the many false claims it has already submitted by virtue of its fraudulent appraisal practices, Nationstar has many other properties that remain listed, but that will inevitably lead to mortgage insurance claims in the near future, once their respective 6-month claims deadlines pass. These claims, including the examples below, will be affected by the same misconduct:

a. For a property located in Southport, North Carolina, loan number 1108798, Nationstar received an initial appraisal of $63,000 on September 22, 2014. By October 2, 2014, just ten days later, it ordered another appraisal, which ultimately dropped the value to $56,000. Nationstar identified no defects in the initial appraisal that would have justified a second one being ordered. Rather, to further its goal of ensuring a rapid sale and maximum government reimbursement, it ordered a new appraisal under the pretext that the first one exceeded the BPO and because of a lack of buyer interest in the first ten days the property was on the market.

b. For a property located in Pasadena, Maryland, loan number 1031008, Nationstar obtained an initial appraisal of $180,000 on September 3, 2014. Despite noting that its own appraisal review "deemed [the] appraisal supported and reliable," Nationstar nonetheless relied on several unidentified "issues" to order another appraisal within 22 days, which came back with a value of $160,000 – amounting to a 11% decrease in FMV in less than a month that brought the appraised value in line with the BPO.

c. For a property located in Sacramento, California, loan number 803238, Nationstar obtained an initial appraisal of $150,000 on August 27, 2014, which the Appraisal Review Department expressly found "supportive and reliable." Nevertheless, 22 days later, it

ordered another appraisal and received a value of $142,000. Nationstar expressly demanded that the first appraiser not be permitted to conduct the second appraisal.

d. For a property located in Warminster, Pennslvania, loan number 805639, Nationstar obtained an initial appraisal of $160,000 on August 25, 2014, substantially higher than the BPO of $125,000. Nationstar ordered another appraisal on September 30, which cut the value down to $130,000, not because of any identifiable defect in the first appraisal, but because Nationstar was unhappy with the level of activity for the short 33 days on market.

e. For a property located in Marysville, Washington, loan number 831450, Nationstar obtained an initial appraisal of $185,000 on August 18, 2014, substantially higher than the BPO of $165,000. Nationstar' appraisal review department found that the value was "supported and reliable." Nonetheless, just four days later, Nationstar ordered another appraisal that valued the home at $160,000, just under the BPO.

f. For a property located in Espanola, New Mexico, loan number 1039603, Nationstar obtained an initial appraisal of $83,000 on July 31, 2014, substantially higher than the BPO of $48,000. On August 22, just 22 days later, Nationstar ordered a second appraisal, which returned a value of $35,000, even lower than the BPO.

g. For a property located in Canyon Lake, Texas, loan number 1107728, Nationstar obtained an initial appraisal of $98,000 on June 24, 2014, substantially higher than the BPO of $60,000. In assigning the property to the listing agent, Nationstar made clear that "the client [Nationstar] does require the listing agent to be present when the appraiser inspects the property." Nationstar obtained a second appraisal on August 4, without noting any deficiencies in the first, that returned a value of $100,000. Unsatisfied, it obtained a third appraisal on September 18 that returned a value of $105,000. Nationstar directed Relator to review the third

appraisal and persuade the appraiser to decrease the value, and the appraiser ultimately agreed to bring the value down to $100,000. Nationstar was undeterred by the consistent valuations, and ordered a fourth appraisal on October 27. That appraisal returned a value of $78,000. As noted above, Relator had been instructed not to dispute seemingly undervalued appraisals; nevertheless, he noted in the Resnet records that the final, $78,000 valuation is "not reliable."

h. For a property located in Birkenfield, Oregon, loan number 1055155, Nationstar obtained an initial appraisal of $132,000 on August 19, 2014, substantially higher than the BPO of $83,009. Just over two weeks later, on September 4, and without identifying any defects in the first appraisal, Nationstar obtained a second appraisal of $89,000, bringing the value much close to the BPO, though still higher. Nationstar ordered its third appraisal on September 30, which drove the value down further to $80,000.

**E. Nationstar's Appraisal Inflation Practices for Traditional Mortgage Properties**

141. Nationstar is also active in the origination of FHA-backed mortgages, including mortgages taken out by buyers of KB Homes properties. KB homes is a major home builder and seller throughout the United States. According to press reports, Nationstar has been KB Homes' preferred lender since March 2012, and at or around that time, financed 60% of KB Homes buyers that needed financing.

142. Beginning in late 2013, Nationstar and KB Homes launched a joint venture, Home Community Mortgage, LLC. Home Community offers an array of mortgage banking services to KB Home customers. In the January 22, 2013 press release announcing the Home Community launch, Jeffrey Mezger, president and chief executive officer of KB Home, was quoted as saying that "[c]reating Home Community Mortgage with Nationstar is the natural progression of our successful alliance."

143. During his time in Nationstar's appraisal review departments, Relator learned of irregularities in appraisals conducted for FHA-insured traditional mortgages, particularly for KB Homes buyers. Specifically, Nationstar, KB Homes, and Home Community have instituted a pattern of inflating appraisal values to ensure the appraisals match KB Homes' desired sale price, thereby enabling the loan to close and the FHA mortgage insurance to be granted.

144. Though Relator worked primarily on REO properties, on occasion, he assists with appraisals for traditional mortgages. In one instance, involving a property on Cintola Lane in League City, Texas, the appraiser initially returned a value of $184,000 on October 13, 2014, far below KB Homes' actual sale price to a buyer of $209,727. Kenneth Hoover, the Nationstar review appraiser who primarily handles appraisals on the origination side, signed off on the appraisal as reliable. Nationstar, through Home Community, challenged the appraisal, without identifying any defects in the initial appraisal, other than disagreement over whether all of the appropriate comparables had been considered. Nationstar placed pressure on the appraiser to revise the value, who ultimately came back with a value of $210,000, just above the sale price. Neither Mr. Hoover nor Relator would sign off on the appraiser's valuation, which they believed to be defective and ultimately too high. Ultimately, Mr. Safavi approved the appraisal himself, knowing that executive management would not tolerate appraisals that did not support KB Homes' desired sales price and that would delay or prevent the mortgage loan from closing.

145. Nationstar and Home Community have a consistent practice of challenging any appraisal that is less than the home's sale price. Relator provides the following additional examples:

a. For a property located on Scandicci Lane in League City, Texas, Project No. 00884 210, KB Homes sold the property for $213,070 on March 14, 2014. On October 27,

2014, after the home was built, the appraisal valued the home at $205,000. Home Community disputed the appraisal with Valuation Partners on the basis that different or additional comparables should have been used. That same day, the appraiser increased his estimate to $215,000.

b. For a property located in Tavares, Florida, loan number 265900163, Home Community challenged an appraisal because it valued the home at $184,000, whereas the home sold for $187,119.

c. For a property located in San Antonio, Texas, loan number 265500805, Home Community challenged the appraisal because it valued the home at $221,000, less than the sales price of $233,500. In support of its challenge, Home Community only identified properties that were not in fact comparable.

146. By using inflated appraisals, Nationstar will cause the government to insure the mortgage at a higher amount, and consequently to pay more than it should on any resulting mortgage insurance claims.

### F. Nationstar's False and Fraudulent Appraisal Practices Cause Damages to the Government

147. Each Nationstar HECM mortgage insurance claim that is based on a depressed appraisal values—including ABCs that list the depressed appraisal value and SBCs that list a sales price based on the depressed appraisal value—misrepresents the value of the home for purposes of the mortgage insurance reimbursement.

148. Each Nationstar HECM mortgage insurance claim that is based on depressed appraisal values—including ABCs that list the depressed appraisal value and SBCs that list a sales price based on the depressed appraisal value—violates the express certification on HUD Form 27011 that all information submitted on that form is "true and correct."

149. Each Nationstar HECM mortgage insurance claim that is based on depressed appraisal values—including ABCs that list the depressed appraisal value and SBCs that list a sales price based on the depressed appraisal value—violates appraisal and claims submission regulations that Nationstar impliedly certifies compliance with by virtue of participating in the HECM program and submitting HECM claims. Compliance with those violated regulations are material to the government's decision to pay HECM mortgage insurance claims and the amount it will pay in satisfaction of the claims.

150. Each time FHA approved a mortgage insurance claim based on sale or appraisal values affected by Defendants' fraudulent appraisal schemes, whether for traditional or reverse mortgages, Defendants caused the presentation and payment of a false or fraudulent claim.

151. In addition, each mortgage insurance claim, whether for traditional or reverse mortgages, based on sale or appraisal values affected by Nationstar's fraudulent scheme, represents a false or fraudulent record or statement to induce the United States to pay or approve a false or fraudulent claim.

152. The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by defendants, paid and continues to pay claims that would not be paid but for Defendants' fraudulent appraisal scheme.

153. As a result of Defendants' actions as set forth above, the United States has been, and will continue to be, severely damaged.

## VI. CAUSES OF ACTION

### COUNT I

### VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A), ET SEQ.

154. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

155. This is a civil action brought by Relator, on behalf of the United States of America, for treble damages and penalties against Defendants under the False Claims Act, 31 U.S.C. §3730(b)(1).

156. Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

157. The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by defendants, paid and continues to pay claims that would not be paid but for Defendants' fraudulent appraisal scheme.

**COUNT II**

**VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B), ET SEQ.**

158. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

159. This is a civil action brought by Relator, on behalf of the United States of America, for treble damages and penalties against Defendants under the False Claims Act, 31 U.S.C. §3730(b)(1).

160. Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records and/or statements to get false or fraudulent claims to the United States paid, in violation of 31 U.S.C. § 3729(a)(1)(B).

161. The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by defendants, paid and continues to pay claims that would not be paid but for Defendants' fraudulent appraisal scheme.

**COUNT III**

**VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G), ET SEQ.**

162. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

163. This is a civil action brought by Relator, on behalf of the United States of America, for treble damages and penalties against Defendants under the False Claims Act, 31 U.S.C. §3730(b)(1).

164. Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

165. Through the acts described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

166. The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by defendants, paid and continues to pay claims that would not be paid but for Defendants' fraudulent appraisal scheme.

**COUNT IV**

**VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(C), ET SEQ.**

167. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

168. This is a civil action brought by Relator, on behalf of the United States of America, for treble damages and penalties against Defendants under the False Claims Act, 31 U.S.C. §3730(b)(1).

169. Through the acts described above and otherwise, Defendant entered into a conspiracy with unnamed co-conspirators, including mortgage servicing companies, appraisal management companies, listing agents, and appraisers, to defraud the United States by getting false or fraudulent claims allowed or paid, violating 31 U.S.C. 3729(a)(1)(C). Defendant has taken substantial steps in furtherance of those conspiracies, inter alia, by (a) knowingly and fraudulently inflating, and causing inflation of property appraisals on FHA-backed traditional mortgages; and (b) knowingly and fraudulently deflating, and causing deflation of property appraisals on FHA-backed HECMs.

170. The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by defendants, paid and continues to pay claims that would not be paid but for Defendants' fraudulent appraisal scheme.

## VII. PRAYER FOR RELIEF

WHEREFORE, Relator requests judgment against Defendants as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating the FCA;

B. That judgment be entered in the United States of America's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for

in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less $5,500 or more than $11,000 per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990;

C. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

D. That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relators in the prosecution of this suit; and

E. That Relator be granted such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated: December 30, 2014

Respectfully submitted,

By: Rachel Geman

Rachel Geman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Robert J. Nelson
Nimish R. Desai
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 9411-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Relator*